[No. 2132.]

### *Ex Parte* Henry Schamberger.

Habeas Corpus — Bail — Evidence.— See the statement of the case for evidence upon a proc·eding by *habeas corpus* for bail, under a charge of murder, *held* not to authorize the refusal of bail.

*Habeas Corpus* on appeal from Hunt County. Tried in chambers before the Hon. J. A. B. Putman, Judge of the Eighth Judicial District.

The applicant was held under an indictment which charged him with the murder of Anna Smith, in Hunt county, Texas, on the 2d day of July, 1885. He was awarded a writ of *habeas corpus*, but, upon the same being heard in chambers, he was denied the privilege of bail and remanded to the custody of the sheriff. A synopsis of the lengthy statement of facts is set out, inasmuch as it presents a case of more than ordinary interest.

Miss Lou. Vansickle was the first witness introduced by the applicant. She testified that she had known the applicant for several years, and Anna Smith, the deceased, about ten months, during which time she and deceased had been often together. Witness and deceased went to Greenville, Hunt county, together in a buggy, on Monday, July 1, 1885. While in town they met the applicant

and Mr. Mansel Mathews, who asked them for their company to a party to be given that night at Roberts Station, about sixteen miles south of Greenville, and between Greenville and Terrell. Witness and Anna agreed to attend the party with the gentlemen named. Going home (to the witness's father's house) on that evening, the witness and deceased stopped at the house of the deceased's mother to get deceased's clothes. The deceased had been staying at the house of the witness's father since the preceding Monday night. Mrs. Smith refused to let her daughter, the deceased, have her trunk, and witness and deceased went on to witness's home. It was arranged that Mr. Mathews was to escort the witness, and applicant the deceased. The two men, each with a buggy, reached the house of the witness's father nearly an hour before sundown, and the party started to Roberts Station about ten minutes later, the witness and Mr. Mathews in one buggy and the deceased and Schamberger in the other. Witness's father was very much opposed to witness going so far at night, but yielded a reluctant consent to the importunities of deceased and Mr. Mathews. Deceased and applicant traveled ahead of witness and Mathews. When the parties reached a point about one mile from Payne's store, which was several miles from home and four miles from Roberts Station, the two buggies were stopped, and deceased, applicant and Mathews took a drink of whisky. Witness was not in the habit of imbibing whisky and declined to indulge, but accepted some candy. The buggies started again in the same order, that of applicant ahead. After traveling some little distance applicant's buggy took the wrong road, or rather a longer road, and got behind the buggy in which witness and Mathews were traveling. They overtook witness and her escort about a mile from Roberts Station, where applicant, deceased and Mathews took another drink of whisky. The parties then went on and arrived at Roberts's house between 8 and 9 o'clock. Applicant, deceased and Mathews took two drinks of whisky each before they went into the house, and the witness took one drink of blackberry wine.

Getting into the house, the witness and deceased danced first with their escorts, and changed partners for the second dance. Deceased danced the next set with Doctor Mings. Afterwards the parties, witness and her escort and Schamberger and deceased, went out and took walks on the railroad track. They all started back home between 1 and 2 o'clock. When the two gentlemen brought the buggies around to the front of the house, Mathews told applicant to hold the horses while he went in to get witness and deceased.

When Mathews went into the house, leaving Schamberger in charge of the teams, some small boys proffered to hold .the horses, and when Schamberger, having accepted their services, went into the house, the boys drove off with Mathews's buggy. The parties, however, got started home finally, Schamberger and the deceased leading in their buggy. Witness saw no more of them until they reached a point about one mile from Payne's store in the direction of Greenville. Just as witness and her escort started down into the branch in their buggy, speaking at the time of the deceased, witness heard the deceased's voice saying: "I will not disgrace you, Lou." Witness then called: "Is that you, Anna?" Deceased replied in the affirmative, and witness asked her what had happened, and if she and Schamberger had quarreled? She replied that they had; that she would not ride further with him, and that she intended to remain where she was. She was then sitting but a few feet from the roadside, north of the branch. Witness and her escort attempted to persuade her to ride in their buggy with them, but she refused. Witness told her that she ought not to remain where she was all night; that she ought to ride with her, the witness; that she was not too good to do it, and was no better than witness; and finally that, as a last resort, they would compel her to ride in their buggy. Deceased replied that Schamberger had gone home. Witness replied that she thought not, and that she and her escort would overtake and send him back.

Witness and her escort then started on and found Schamberger standing at the heads of his horses, about seventy-five or one hundred yards from where he had left the deceased. He told witness and Mathews that deceased became angry, and refused to ride further with him. Witness and Mathews then persuaded him to go back to the deceased. Mathews held his horses while the applicant walked back. Presently witness and Mathews heard Schamberger and defendant talking in apparently a friendly voice. After waiting some time for them, and thinking they heard them coming, Mathews tied Schamberger's horses and unhitched the team and drove off with witness. It was now very late, the first flush of daylight being visible. When Mathews and witness reached Caddo, some little distance from where they left Schamberger's buggy, they were overtaken by the empty buggy. The traces were then hitched, but the lines were fastened just as Mathews left them. Mathews stopped and hitched the team, and he and witness turned their buggy and drove back as far as Powell's house, which was about a mile from where they had left the deceased. At that point they

met Schamberger weeping, moaning and "taking on" in a very violent and distracted manner. He told witness and Mathews that Anna Smith had killed herself; that she snatched his pistol from his waist and shot herself just as he was fastening the last trace, and that he was going back to her body and kill himself. Schamberger then got into the buggy with witness and Mathews, and the three started to the body. Schamberger urged Mathews to drive faster. He had his pistol in his hand when witness and Mathews met him, and kept it in his hand all the way back to the body. When he reached the body he placed the pistol to his head and said that he would kill himself, but desisted when pleaded with by the witness.

Schamberger said, when he met the witness and Mathews, that he attempted to kill himself, as soon as Anna shot herself, but that his nerve failed him; that he shot himself twice and fired a third shot at himself, but missed his body. Witness saw two bullet holes in his clothing, and noticed powder-burn. He said that he would gladly give the world, if he owned it, to have Anna back; that he loved her best of all people, and would have married her had she lived. When the three parties reached the body, Schamberger sprang out of the buggy before it stopped, and, with his pistol in his hand, ran to the body, fell down by it, passed his left hand under her head, laid his face on her cheek, and rested his right hand, in which he held the pistol, on the ground. While he was lying there "taking on," the witness sprang out of the buggy, secured his pistol and returned to the buggy with it. Witness and Mathews then drove off south, and thence home, witness, *en route*, discharging the two loads remaining in the pistol.

On the Friday before this occurrence Anna Smith came to witness's house and begged witness to go home with her and ask her mother to allow her to go home with witness and remain until Saturday evening, in order to make a new dress. For some time the witness declined to comply with the request, because Anna had no intention of making a new dress, but in fact wanted witness to go with her to a picnic on Saturday at Wade's school-house. Schamberger came to witness's house on Saturday, and he, witness and Anna went to the picnic in the same buggy. Returning that night, Anna insisted that the drive should be continued. Witness and Schamberger protested, but were finally overruled by Anna, who insisted on driving a few miles further. Reaching the neighborhood postoffice after driving several miles, Schamberger stopped the buggy and wanted to go back. Anna demurred and insisted that the drive should be extended farther towards Greenville. The party

drove on, and when they reached Long Branch, about two miles from Greenville, witness told Schamberger to stop; that it must be about 9 o'clock, and was too late to go into Greenville. Witness was so intent upon going back that she grasped the lines and turned the buggy herself. Anna then sprang out of the buggy and went down the incline towards the creek, saying that she wanted to get some water. After she had been gone a short time Schamberger got out of the buggy and followed after her. Before Schamberger could reach the creek, witness heard a splash in the water as if something or somebody had fallen or jumped into the creek. Witness called to Schamberger that Anna was in the water. Schamberger went on down to the creek, and he and Anna stayed down there about two hours, during which time the witness did not know what they did. Anna returned to the buggy at the end of two hours, wet from head to foot. She said that she was cold, wet and hungry, and that she was going to Greenville, in which direction she started. She refused to return, and Schamberger proposed to go after her. Witness replied that if they followed her with the buggy, she would refuse to get in. Witness finally sent Schamberger after her. He returned with her presently, and she declared that she would not go home until she had been to Greenville and had something to eat. Accordingly the party drove into Greenville, stopped in front of the coffee house, and procured some bread, meat and eggs. They then drove back to witness's house.

On the following Monday morning Anna left witness's house to go home. She returned that night about 1 o'clock, when witness asked her where she had been, and what she had been doing. She said that when she went home on that morning her mother said to her: "Oh, yes, I have caught up with you; you have been down yonder to see Schamberger." She said that her mother told her that she had disgraced the family and must go, and that she had been in the Caddo bottom all day and night, without a morsel of food, and that unless the witness would take her in, she had no idea what she could do or where she could go. She said also that she would have killed herself in the bottom, but had no weapon; that she thought of drowning, but as she had tried that means once, she had contracted an unexplainable horror of that manner of death. When Schamberger and Anna got back to the buggy from the creek, Anna said to Schamberger: "You got there just in time to keep me from drowning." Deceased weighed about one hundred and twenty-five pounds. Witness identified the pistol in evidence as the one Schamberger had on the night of Anna Smith's death.

Mrs. Surella Schamberger, the wife of the applicant's brother William, was the next witness for the applicant. She testified that she saw the deceased on the Tuesday before the Wednesday night of her death. She came to the witness's house, which was situated about one mile from Mr. Vansickle's house, and told witness that her mother drove her from home on the day before, and that she had wandered in the Caddo bottom all day, and would have killed herself but had no weapon. She said, also, that she would have resorted to drowning, but a previous attempt had given her a horror of that manner of death. She said, further, that she had no idea what she could do with herself, as she had no friend unless Henry Schamberger would still be her friend. Witness advised her not to harm herself, and to go back home. She replied that she would beg her bread before she would return home; that her father had beaten her and her mother had driven her off, deaf to her two sisters's pleading in her behalf.

Robert Willis, the applicant's brother-in-law, testified in his behalf that he was familiar with the applicant's financial condition. He had applicant's notes and accounts in his possession, and knew more about applicant's business than anybody save the applicant himself. Applicant owned no property whatever. His brothers and other relatives are all poor, and owned but little property. Witness thought the applicant could give, perhaps, a four or five thousand dollar bond, but was not sure of even that. He would have to rely on his relatives, and could not give a larger bond than for the amount named. Applicant did not own the gin he has been running. The interest which he owned in the land on which the gin business was conducted, he deeded to Mr. Kay, before Mr. Kay's death. The applicant closed.

J. M. Wilson, the first witness for the State, testified that he had known the applicant since he was quite a youth, but had seen comparatively little of him since he had lived in Hunt county. Witness met him in Greenville a short time before the death of the deceased. He asked witness how he was getting along, and if he was as wild as he used to be. He then remarked to the witness that he was still wild, and had recently been in considerable trouble about a woman; that he and the girl were all right, but he was having trouble with her parents, and that his trouble about the girl had cost him heavily in money. He said, also, that he apprehended trouble with the old folks about the girl. He said nothing about his necessity of getting a woman out of the way. He said nothing about being in danger of going to the penitentiary unless some one

was removed from his way before the grand jury assembled. Applicant mentioned no names in this conversation.

Cross-examined, the witness testified that he had long been intimate with the applicant and other members of his family. He did not regard applicant's talk to him as anything singular or unusual, inasmuch as the two had been pretty much raised up together. Witness had been rather wild himself in his youth. Applicant did not mention Anna Smith's name to witness.

A. E. Waldron was the next witness for the State. He testified that he lived at Roberts, Hunt county, Texas. He went to the party at Roberts's house on the night before the killing. He saw the applicant, Mathews, and Misses Anna Smith and Lou. Vansickle there, about 11 o'clock. All of the parties named seemed to be very happy. Miss Smith danced one set with Doctor Mings, a gentleman who had a more than ordinary faculty of making himself agreeable to ladies, and she seemed to enjoy herself thoroughly.

Doctor T. E. Yoakum was the next witness for the State. He testified that he was practicing medicine under a diploma from the Texas Medical College, and another from the Louisville Medical College. He was called to make a post-mortem examination of the body of Anna Smith, on the day after her death. Witness made that examination, but did not make an autopsy. He found a ragged gunshot wound on her left breast, between the third and fourth ribs. The ball passed out on a level with its entrance, about the third dorsal bone. Witness could not tell whether or not the ball punctured the heart. If the heart was in its normal position when the ball was fired, the witness was of opinion that it was touched by the ball. Witness also found some bruises on he inside of the deceased's right leg, between the knee and the hip, and one bruise on the inside of the left leg, all of which bruises appeared to have been inflicted by the finger nails. They were semi-circular in shape and had a blue appearance. Witness examined the deceased's vagina, and found it distended. It contained also a deposit of semen, and the witness believed it to be masculine semen, recently deposited. He examined that deposit under the microscope. He extracted the deposit from the vagina by distending it and using a speculum. The examination disclosed also that the hymen of the deceased was ruptured, but the rupture was an old one. The hymen could be ruptured by other means than by copulation. Witness could not tell when the deceased's hymen was ruptured, nor whether it was ruptured by copulation or by other means. Witness had not known the deceased in her life-time, and could not approximate

her height. Deceased's clothes were badly powder-burned, and the wound was very ragged, which was a sure indication that the weapon used in killing her was held very close to the body. It was the opinion of the witness, judging by the deceased's apparent age, her appearance, and the course of the ball as indicated by the points of entrance and exit, that it was possible for her to have fired the fatal shot herself. There was a wound on the deceased's right fore finger, between the first and second joints, which could have been made by the hammer of a pistol. It was made by a round instrument, such as the hammer of a pistol.

J. H. Cook testified, for the State, that he lived about three miles from the point where the deceased came to her death. He arrived at the scene of the tragedy with the justice of the peace early on the morning of July 2, 1885. The applicant was there moaning and "taking on" over the deceased when the witness arrived. Witness helped to dress the body, and examined it in doing so. The deceased wore a velvet jacket on the outside, and a corset and two light garments under the black velvet jacket. The fatal ball passed through all of the garments mentioned, blackening, scorching and separating them about the entrance of the wound, and powder-burning the flesh. The clothes were not set on fire.

J. P. Powell testified, for the State, that he lived in Hunt county, Texas, about one mile distant from the point where the deceased came to her death. Witness heard the pistol shots, six in all, fired at the time of her death. Four shots were first fired, and two others after some time. Four or five seconds elapsed between the firing of the first and second shots. The third and fourth shots were fired in rapid succession. Some little time after the last shot was fired, witness received word from his brother that a woman had been killed down the road. He repaired to the point indicated, and found the applicant down by the body, weeping and "taking on" violently.

J. R. Powell testified, for the State, that about daylight on the morning of July 2, 1885, while he was yet in bed, he heard the report of a pistol. His wife, who was up kindling a fire, asked: "What do you think that means?" By the time the witness got one foot on the floor in the act of getting out of bed, three more shots were fired in rapid succession. A man could have possibly counted ten between the reports of the first and second shots. Soon afterwards an empty buggy drawn by two horses passed the witness's house. When first seen by the witness, one of the horses drawing the buggy was in a gallop and the other in a fast trot.

Soon afterwards the witness heard a man ask the boy in the yard if he was the man of the house. The boy called the witness. Witness went to his door and found Schamberger on the gallery, and a man who called himself Williams sitting on the fence. Schamberger said, "Hello'! Powell." Witness answered: "How do you do, Henry?" Schamberger then said: "Miss Annie Smith, one of my loves, has killed herself, and is lying dead in the road down yonder, and I want a horse to follow my team." Witness told him that he had only the horse he was going to use presently, and that he could not get it. When the witness first saw him he had his pistol in his right hand, and his hat in his left. When witness refused to let him have a horse, Schamberger threw his pistol down on witness, and said: "What would you think if I told you I would have it?" He then said: "Miss Anna Smith has killed herself, and I tried to kill myself. I started in to do this thing, but didn't have the nerve. I intended to kill myself too." He said further: "By G—d, it will make no difference; they will hang me anyhow."

About this time Mr. Vansickle and Mr. Mathews appeared in the distance, in a buggy, coming towards witness's house. As soon as he saw them Schamberger's face brightened up, and he started towards them, saying: "Thank God, there they come." He met them, told them that Miss Smith had killed herself, and he got in the buggy with them, and went to the body. Williams, Johnny Hunter and the witness followed. Before reaching the body, witness heard two shots, and presently met Mr. Mathews and Miss Vansickle coming back. Reaching the point where the deceased was killed, they found her body lying some five or six feet from where the buggy was said to have stood. The applicant was down by the body, weeping and talking. Presently he said that he wanted some water, and Johnny Hunter brought some in a hat. Most of the water leaked out of the hat, and witness told applicant to go with him to the creek and get water. He complied, and after he got some water he went to a tree, indicated a point near it, and said: "There is where she sat. I would give the world if she was back now as then." Witness found a match box near that point, which the applicant said was his. Witness also noticed an impression in the ground which showed that a woman had sat there. This impression was about one and a half feet from the tree, and near a root. Some three or four feet from the impression described, witness saw the print of a man's toes in the sand. There were a dozen or more of such prints. Going back to the body, applicant took off his coat and told witness to put it under the head of the deceased.

He then told witness to cut some brush and cover the body with it, and that he would pay witness for his trouble. While he was "taking on," the applicant said that he saw her draw her last breath; that the last thing she said was: "Henry, don't do that;" that he said he would die by her. He said that he would give the world to be able to recall six hours.

Cross-examined, the witness testified that the applicant appeared very much excited when he reached witness's house; talked disconnectedly and at random. Witness understood him to be talking about himself when he said that he had started into the thing with the intention of carrying it out, and lost his nerve. He had quit talking about himself when witness saw him at the body. He said throughout that the girl killed herself.

Re-examined by the State, the witness testified that the applicant told him twice that he turned his team loose in the wrong direction. Witness found a piece of paper near the body of the deceased, and proceeded to read it. Applicant, however, jerked it from his hand, and in doing so tore it in twain, and threw the pieces down. Witness secured the pieces and put them together, and read the note as follows: "I am a dead man. She killed herself. If it was to do over I would,"— or "would not," witness could not now remember which.

The statement of Mr. Mathews, the escort of Miss Vansickle on the fatal night, testifying for the State, was in substance the same as that of Miss Vansickle, except as to what transpired on Saturday night, about which he testified nothing.

Charley Simmons testified, for the State, that, returning home with a load of wood on the Friday evening next after the death of Miss Smith, he stopped his team a few steps north of the tree where Miss Smith was said to have been sitting when Mathews and Miss Vansickle passed them, just before the killing. Looking east, about twenty yards from the tree, witness saw a discoloration in the ground which he proceeded to examine. He found it to be a pool of dark blood, about one foot in diameter, and from an inch to an inch and a half deep. Witness showed that pool to Mr. Powell some days afterwards, at which time the blood had dried, and the place on the ground had assumed a reddish or yellowish dark color. A rain had fallen on it since the witness first saw it. The pool of blood described was under a tree about twenty-five yards northeast from the tree on the branch where it was said Miss Smith was sitting when Mathews and Miss Vansickle first passed her, just before her death. It was about seventy-five yards from the point where the body was found.

J. R. Powell, recalled by the State, testified that on his arrival on the scene of the killing, shortly after it happened, he carefully examined the ground for blood. On Friday evening John Simmons called witness's attention to a discolored spot near a tree, which he insisted was a blood pool. Witness did not think it a blood discoloration. It was evident that a horse had been hitched to the tree, and the discoloration looked to him more like the effects of horse urine than of blood. Witness passed over that ground hunting traces of blood on the day of the killing, and saw none there, though he could not remember that he particularly noticed that exact spot. If that discoloration was there on that day, it was certainly covered up, or witness would have seen it.

Mrs. Smith, the mother of the deceased, testified, for the State, that Anna, had she lived, would have attained her seventeenth year in October, 1885. She was a medium sized woman. Anna left home on the Friday before the Wednesday of her death, to go to the house of Mr. Miles Vansickle, and was to return home on Saturday. She went with Miss Lou. Vansickle. She did not return until Monday. She left again about noon on the same day, and, except as she passed the house and stopped for a few minutes on Wednesday evening, the witness saw no more of her alive. She was killed between then and next morning.

Cross-examined, the witness stated that, in opposition to the wishes and commands of herself and her husband, the deceased had for some time been keeping company with Henry Schamberger. She went to an exhibition at Caddo with Mr. Schamberger, about two or three weeks before the killing, leaving on Friday evening and not returning until Saturday evening. She then told witness that she and Schamberger stopped over night at a school-house to avoid a rain. Her father reprimanded her severely for staying out over night, and attempted to whip her. She and her father were both in liquor. While at home on the Monday before her death, she told her sister about going to the picnic at Wade's school-house on Saturday, and to Greenville on that night, for which conduct the witness upbraided her, and told her she should not go with Schamberger any more. She retorted that she would go with him, and if witness and her father objected she would leave home. Witness told her in reply not to do that, but she said she would, and she did leave. Witness did not drive her off. Witness missed the deceased from her bed one night, after she professed to have retired. When she returned, the deceased refused to tell witness where she had been. Witness, thinking she had been out to meet Schamberger, made her sleep in her, witness's, room after that night. On the Monday she

last left home, Anna wrote a farewell letter to her family, on the fly-leaf of a book, which letter the witness here produced, declaring the same, signature and all, to be Anna's handwriting. The letter reads as follows:

"Good-bye to the family. Forget, but I will not ask you to forgive. I have disgraced you, but I will never more impose myself upon you. Jim, I am no one to give advice, but do as you are doing now, and let no one have influence over you. Belle, do just the opposite of what your disgraceful sister has done, and the world will honor you. Beula, mind Ma, and be a good girl. Ma, I am sorry it is so I have to leave you, but it is too late to repent now. Pa, never spoil another one of your children by giving them too much rope. For your soul's sake, and for the sake of a family who look to you for support, quit the damnable cup. It has ruined you and me. And now forget that I ever existed. To those who once were friends of mine, ask them to think of me only when I was good. Now farewell, for time eternal!            ANNA."

On her re-direct examination the witness described the wound on the body of the deceased, and said that she had seen the deceased fire a gun, but did not know whether or not she could fire a pistol.

Jeff. Johnson testified, for the applicant (the State having closed), that on the evening of the deceased's return from the exhibition at Caddo, spoken of by Mrs. Smith, Miss Belle Smith, the deceased's sister, came to the house of the witness's brother, near by, to get witness and his brother to go to Smith's house, to prevent Smith from injuring the deceased. Arriving at the house they found Smith and his daughter on the bed struggling, both drunk, and both cursing the other. When he was pulled off, Smith told his daughter, the deceased, that if she stayed at his house she would have to behave. She replied that if he said so she could leave and play "Jim Fisk," and something else the meaning of which witness did not comprehend. Witness had heard the deceased sing fragments of a song called "Jim Fisk," which he had understood was a bawdy house melody.

*R. L. Porter, D. Upthegrove, Perkins & Gilbert*, and *Terhune & Yoakum*, for the applicant.

*J. H. Burts*, Assistant Attorney-General, and *Sherrill & Austin*, for the State.

WILLSON, JUDGE. After a careful consideration of the evidence in this case, we have concluded that the applicant is entitled to bail,

and that the amount of his bail be and is fixed at the sum of $3,000. It is therefore ordered that said applicant, Henry Schamberger, be admitted to bail in said sum of $3,000, and that upon his giving such bail in accordance with law, he be released from custody.

*Ordered accordingly.*

[Opinion delivered December 9, 1885.]